IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


ABIODUN ADEFURIN,                    )
                                     )
            Plaintiff,               )        NO. 3:21-cv-00791
                                     )
v.                                   )        JUDGE RICHARDSON
                                     )
MEHARRY MEDICAL COLLEGE,             )
                                     )
            Defendant.               )
                                     )
                                     )
                                     )


**<u>MEMORANDUM OPINION</u>**

Pending before the Court is the motion for summary judgment of Defendant Meharry Medical College ("Defendant") (Doc. No. 19). In its Motion, Defendant asks the Court to grant summary judgment in its favor pursuant to Federal Rule of Civil Procedure 56. Plaintiff, Abiodun Adefurin, filed a response to Defendant's Motion (Doc. No. 27), and Defendant has filed a reply in support of its Motion (Doc. No. 34).

For the reasons discussed herein, the Court will grant Defendant's Motion.

Defendant operates a "health science center," which includes a medical school in Nashville, Tennessee. (Doc. No. 20 at 1–2; Doc. No. 27 at 1). Plaintiff is a medical doctor and worked for Defendant as a resident physician in Defendant's medical residency program from July 2016 to June 2019. (Doc No. 28 ¶ 1). Yvonne Berko ("Chief Resident") was the co-chief resident for the 2018-19 academic year and the chief resident at the Alvin C. York Veteran's Administration Medical Center in Murfreesboro ("VA Medical Center").[2] (*Id.* ¶¶ 4, 6).

---

[1] The facts that are stated herein without qualification are undisputed—a term the Court will use to describe both facts that are not in dispute *at all* and facts that are not in *genuine* dispute—and are treated as such. Alleged facts that are qualified here in some way (as for example by being prefaced with "Plaintiff contends that") are in dispute and are treated as such.

Some of the facts herein come from Plaintiff's responses to Defendant's statement of undisputed facts (Doc. No. 28) ("Plaintiffs' Responses"). Other facts herein come from Defendant's responses to Plaintiff's statement of undisputed material facts (Doc. No. 35). In its Responses, Defendant makes at least one objection to each of the 50 paragraphs, for the most part based on Local Rule 56.01(b) and on the argument that the facts asserted are either not material, or argumentative, or both. (*See generally* Doc. No. 35). The objections based on Local Rule 56.01(b), which requires in relevant part that "[e]ach fact . . . be set forth in a separate, numbered paragraph," are well taken but are denied for the sake of judicial efficiency. The Court will also deny the objections based on materiality—or lack thereof—for the reasons explained in its Order on Defendant's "Motion to Strike Declaration of Adefurin, M.D." (*See generally* Doc. No. 41). Defendant also objects to some statements on the basis that "the record citations do not support" the statements at issue. (*See generally* Doc. No. 35). These are not truly objections but rather an indication that Defendant disputes these facts, and the Court will construe these objections accordingly. Finally, Defendant objects to some statements on the basis that they are not statements of "facts" at all. (*See generally id.* (citing *F.T.C. v. Internet Mktg. Grp., Inc.*, No. 3:04-0568, 2006 WL 273540, at *7 (M.D. Tenn. Feb. 2, 2006) (rejecting attempts to disguise inferences and arguments as facts))). The Court disagrees that these statements contain no (alleged) facts but will disregard any arguments in such statements and will draw no impermissible inferences therefrom.

Other facts contained herein come from record evidence (such as depositions) and are cited (as being accurate) by the opposing parties in their respective briefing. Other facts (background, uncontroversial ones) are mutually stated in the parties' opposing briefing (Doc. Nos. 20, 27, 34).

Finally, some of the facts contained herein come from uncontroverted portions of Plaintiff's Complaint (Doc. No. 1).

There are other purported facts that are disputed but are evidentially supported and are asserted by Plaintiff or Defendant, as the case may be with respect to a particular fact, to support the asserting party's view as to whether there is or is not a genuine issue of material fact as to a particular claim. The Court treats these purported facts as potentially but necessarily true and refers to them, and the evidence supporting them, in appropriate places in its analysis below.

[2] Plainly, Plaintiff was assigned to (*i.e.*, rotated through) the VA Medical Center for a period of time during, and as part of, his participation in Defendant's medical residency program their residency.

On April 13, 2018, Plaintiff requested paternity leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et. seq.*, which Defendant approved. (*Id.* ¶ 2). Plaintiff's leave began on May 27, 2018, and ended on June 11, 2018. (*Id.* ¶ 3; Doc. No. 1 ¶ 9). Defendant's Program Director for Internal Medicine ("Program Director") recalls that "there was talk among [r]esidents . . . [about some residents] abusing FMLA leave" at Defendant's medical school "during the relevant timeframe." (Doc. No. 35 ¶ 27; *see* Doc. No. 27 at 1–2). The Program Director raised this issue of repeated instances of FMLA leave by residents in a group text message ("Group Message") referencing a meeting with residents and chief residents in June of 2018. (Doc. No. 28 ¶¶ 30–32). In relevant part, the Group Message states:

> There are two things that arose during the meeting though:
> A) The fact that people have been calling in sick/requesting FMLA [*sic*] and the disruption in clinic. Although the leadership know [*sic*] some of those requests are genuine, they have also noticed a repetitive pattern which has raised concerns among the attending[] [physicians] who are now questioning our reasons. [T]hey mentioned that there would be repercussions if they find a pattern, which can potentially hurt our recommendations for work in the future . . . [.]

(Doc. No. 29-3).

On October 5, 2018, after the end of his period of FMLA leave, Plaintiff was scheduled to work at the VA Medical Center but did not report for his shift on that day because he was out of town. (Doc. No. 28 ¶ 5; Doc. No. 35 ¶ 34). Plaintiff did not inform the Chief Resident that he would not work on October 5, 2018, "because [the Chief Resident] was not at work that entire week." (*Id.* ¶ 35; Doc. No. 28 ¶¶ 7–10). Plaintiff, however, "notified his two [a]ttending [p]hysicians that he would be off." (Doc. No. 35 ¶ 36). There was also "no need to fill out a leave request form" for a resident taking only one or two days off. (*See id.* ¶ 39). On that same evening, a Friday, the Chief Resident emailed Plaintiff, asking why he did not show up to work. (Doc. No. 28 ¶ 11). Plaintiff did not respond to this email. (*Id.* ¶ 13). There was "no policy requirement" that

Plaintiff respond to this email because it was sent after hours. (Doc. No. 35 ¶ 40). On Monday

morning, the Chief Resident emailed Plaintiff again, "reiterat[ing] her request for an explanation

for [Plaintiff's] absence, [Plaintiff's] failure to notify [the Chief Resident] of his absence, and

[Plaintiff's] failure to respond to [the Chief Resident's] Friday email." (Doc. No. 28 ¶ 12). That

afternoon, Plaintiff responded:

> Hi [Chief Resident],
> I was away on Friday 10/05/2018 for an interview. The podiatrist who I was to be with
> Friday morning was fully aware of my interview and my . . . attending [physician] was also
> fulling [*sic*] aware and he was okay for me to go for my interview as we had backup
> coverage for my clinic patients.
> However, from Monday 10/01 to Thursday 10/04 while I was in the VA [Center], you were
> absent from work. I asked a fellow resident about your presence and the resident informed
> me he/she had spent 2 weeks in the VA [Center] without seeing you at work. If you were
> not absent from work, I would have informed you of my interview on Friday.
> Furthermore, I did not work over the weekend and as such this email response is within
> one business day of your first email that was sent late Friday evening which is in contrast
> to the three days you alluded to in your last email.
> Let me know if you have any additional questions.

(*Id.* ¶ 13).

"On October 22, 2018, the Chief Resident issued a written reprimand to Plaintiff for

unprofessional conduct . . . and referred him to the [relevant committee] for disciplinary action.

(*Id.* ¶ 14). The grounds for the reprimand were, *inter alia*, Plaintiff's failure to request permission

for his absence as well as the "extremely contemptuous" email response, which the reprimand

describes as "generally disrespectful and connotat[ing] disdain." (*See* Doc. No. 22-1 at 123).

Plaintiff appeared before said committee the next day, received a two-week suspension, and

learned that the suspension "would be reflected in his permanent folder and reported to any

inquiries concerning his training." (Doc. No. 28 ¶¶ 14–15; *see also* Doc. No. 22-1 at 125–26 (letter

of suspension)). The committee provided Plaintiff with a summary of his "violations" and

"professional misconduct" in a letter of suspension, dated November 1, 2018, as follows: (1)

"insubordination to a superior through deliberate refusal to respond to her queries of your whereabouts"; (2) "[l]eaving your work and post without . . . written permission"; (3) "[d]isrespectful and [u]nprofessional behavior towards a supervisor when you finally decided to respond 3 days or so later." (Doc. No. 22-1 at 126). The committee "did not conduct [its] own investigation" or speak to the attending physicians that Plaintiff had notified of his absence and "relied solely on the information provided by [the Chief Resident.]" (Doc. No. 35 ¶ 42–43). Plaintiff unsuccessfully appealed this decision, which was unanimously upheld by an appellate committee on December 6, 2018. (Doc. No. 28 ¶¶ 17–18; *see also* Doc. No. 22-1 at 131 (decision of the appellate committee)). The appellate committee also recommended that Plaintiff be required to complete a "professionalism course." (*Id.*). Plaintiff's suspension was in effect from December 9, 2018, through December 22, 2018. (*Id.* ¶ 19). "Other residents [who failed to show up for their respective shifts were] not suspended," but Defendant denies that these other residents were situated similarly to Plaintiff. (Doc. No. 35 ¶ 50).

"It is possible to expunge the suspension from [Plaintiff's] record." (*Id.* ¶ 44). Plaintiff met with Defendant's Chair of Internal Medicine ("Chair"), with whom he discussed "wiping his record clean." (*Id.* ¶ 45). Plaintiff "completed all of what was required of him," but Defendant "refused to remove the discipline from his record." (*Id.* ¶ 46). Specifically, the Chair wrote Plaintiff a recommendation letter but refused to remove the disciplinary action from Plaintiff's academic file. (*Id.* ¶ 47; *see also* Doc. No. 29-11 (letter of recommendation)). A disciplinary action "follows a doctor . . . and inhibits [his or her] ability to get medical board licensing, credentialing, and employment." (*Id.* ¶ 49). Plaintiff was rejected for a position with a prospective employer in September of 2019. (Doc. No. 28 ¶ 20). According to Plaintiff, this rejection was caused by his suspension by Defendant. (*See id.* ¶ 22).

Defendant alleges that the discipline and suspension were in retaliation for him exercising his rights under the FMLA. (*See* Doc. No. 1 ¶¶ 21–25). That is, his (sole) claim is one of so-called "FMLA retaliation," *i.e.*, retaliation in violation of the FMLA, namely 29 U.S.C. § 2615(b).

<u>LEGAL STANDARD</u>

A. <u>Summary Judgment</u>

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Reeves v. Swift Transp. Co.*, 446 F.3d 637, 640 (6th Cir. 2006) (citing *Anderson*, 477 U.S. at 248), *abrogated on other grounds by Young v. Utd. Parcel Serv.*, 575 U.S. 206 (2015). A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634–35 (6th Cir. 2018). The party bringing the motion for summary judgment has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). Alternatively, the moving party may meet its initial burden by otherwise "show[ing]"—even without citing materials of

record—that the nonmovant "cannot produce admissible evidence to support a material fact (for example, the existence of an element of a nonmovant plaintiff's claim)." Fed. R. Civ. P. 56(c)(1)(B). If the summary judgment movant meets its initial burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Pittman*, 901 F.3d at 628. Importantly, "[s]ummary judgment for a defendant [that has met its initial burden as the movant] is appropriate when the plaintiff 'fails to make a showing sufficient to establish the existence of an element essential to [her] case, and on which [she] will bear the burden of proof at trial.'" *Cleveland v. Pol'y Mgmt. Sys. Corp.*, 526 U.S. 795, 805–06 (1999) (quoting *Celotex*, 477 U.S. at 322).

Any party asserting that a fact cannot be or genuinely is disputed (*i.e.*, any party seeking summary judgment and any party opposing summary judgment, respectively) can support the assertion either by: (a) citing to materials in the record, including, but not limited to, depositions, documents, affidavits, or declarations, Fed. R. Civ. P. 56(c)(1)(A), or (b) "showing" (i) that the adverse party cannot produce admissible evidence to raise a genuine dispute as to that fact or (ii) that contrary to the claim of the adverse party, the materials cited by the adverse party do not actually establish the absence or presence (as the case may be) of a genuine dispute as to that fact.

In reviewing a motion for summary judgment, this Court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the Court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The Court determines whether sufficient evidence has

been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 674 F. App'x 531, 537 (6th Cir. 2017) (citing Fed. R. Civ. P. 56(c) advisory comm. note to 2010 amend.).

B. The *McDonnell Douglas* Burden-Shifting Framework

The Court will take a moment to discuss the *McDonnell Douglas* standard and its applicability to motions for summary judgment in the context of employment-discrimination claims in the federal judicial system. The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden-shifting framework (in a case that happened to involve Title VII discrimination claims) as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, [411 U.S. 792, 802–03 (1973)].

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

The burden-shifting approach in *McDonnell Douglas* applies only to discrimination or retaliation claims premised on so-called indirect (*i.e.*, circumstantial) evidence.[3] *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019). The undersigned has explained:

> When a defendant-movant challenges a plaintiff's ability to reach a jury on an indirect-evidence theory of employment discrimination, there are a number of steps potentially implicated, though not all of them necessarily need be addressed in the analysis. The number of steps to be addressed depends on whether the defendant-movant seeks to prevail at the first step, or at the second and third step, or at both the first step and the second and third step . . .

> To prevail at the first step of *McDonnell-Douglas*, the defendant, as the summary-judgment movant, must meet its initial burden of showing an absence of evidence from which a reasonable jury could find the plaintiff established a *prima facie* case. *E.g., Banks v. State of Ohio*, No. 94–3866, 1995 WL 118993, * 2 (6th Cir. Mar. 20, 1995). If the defendant does so, then the burden shifts to the plaintiff to show that at trial it could "make out a *prima facie* case of discrimination by a preponderance of the evidence." *Redlin*, 921 F.3d at 606. If the plaintiff fails to succeed here, then the plaintiff suffers summary judgment in favor of the defendant on the claim. But if the plaintiff succeeds here, defendant does not prevail at the first step and is relegated to try instead to prevail at the second and third steps of *McDonnell-Douglas*.

> At the second step, the defendant-movant has the burden (of production only) to show a legitimate and non-discriminatory reason for its action(s). *Brown*, 814 F. App'x at 80 (noting, on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). If the defendant successfully shows evidence of a non-discriminatory reason for its alleged discriminatory act, the court proceeds to the third step, where "the plaintiff must rebut the proffered reason by producing evidence from a which a reasonable jury could conclude that the proffered reason is actually a pretext" for unlawful discrimination. *Willard v. Huntington Ford, Inc.*, 952 F.3d 795, 807 (6th Cir. 2020) (quotations omitted).

---

[3] "Direct evidence is such that, if true, requires the conclusion that unlawful retaliation [or discrimination] was a motivating factor without any inferences or presumptions." *Banks v. Bosch Rexroth Corp.*, 15 F. Supp. 3d 681, 693 (E.D. Ky. 2014), *aff'd*, 610 F. App'x 519 (6th Cir. 2015) (citing *Norbuta v. Loctite Corp.*, 181 F.3d 102 (6th Cir. 1999)). Indirect evidence is evidence that requires the court to make inferences to conclude that unlawful retaliation or discrimination was a motivator for an adverse employment action.

*Veith v. Tyson Fresh Meat, Inc.*, No. 3:19-CV-01065, 2022 WL 1231229, at *9–10 (M.D. Tenn. Apr. 26, 2022).

If the defendant carries its burden to show a legitimate nondiscriminatory reason, then finally the burden shifts back to the plaintiff to show that the reason offered by the defendant is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 802–04; *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 255–56 (1981). This resulting burden is one of persuasion, and this burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. In other words, once the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence[4] each of two components of pretext: that the defendant's reasons (i) were not its true

---

[4] The "preponderance of the evidence" standard referred to here is the standard that *would apply* at trial. (The Court is aware that it is doubtful that the *McDonnell Douglas* framework even applies at trial; but whether or not the framework does apply at trial, the summary judgment standard is tied to a trial burden *as if* the framework did apply at trial). At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury could make the required finding by a preponderance. This is because, on motion for summary judgment, the question at each stage of *McDonnell Douglas* is "whether there is sufficient evidence to create a genuine dispute at each stage." *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020) (quoting *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000)). And as suggested elsewhere herein, that means the question is whether there is sufficient evidence for a jury to find in favor of the party bearing the burden at a particular stage, under the specific standard applicable to that stage.

So at the first stage of *McDonnell Douglas*, wherein the plaintiff must show an indirect-evidence *prima facie* case by a preponderance of the evidence, on motion for summary judgment (assuming the defendant is able to meet its initial burden so as to shift the burden to the plaintiff), the plaintiff need not convince the presiding judge himself or herself by a preponderance; rather, the plaintiff must convince the presiding judge only that a *reasonable jury could* be convinced by a preponderance of the evidence. (Notably, this is the relevant question in the summary judgment analysis even though a jury actually would never be asked whether the plaintiff established *prima facie* case if, as seems likely, *McDonnell Douglas* is inapplicable at the trial phase). And if on motion for summary judgment the presiding judge reaches the third stage of *McDonnell Douglas*—with its preponderance-of-the-evidence standard for the plaintiff to meet—the question for the presiding judge is not whether *he or she actually* finds by a preponderance of the evidence that the defendant's stated reason is pretextual and that the real reason was discriminatory animus; instead, the question is whether he or she concludes that the plaintiff has shown that *a reasonable jury could find* that this is the case.

As for the second stage, as to which the case law says little about the required quantum of proof for the defendant, it likely suffices to say that there must be *some* evidence to support a claim (even if not to the point of showing by a preponderance) that there was a legitimate reason for the challenged adverse action.

reasons and (ii) were instead actually a pretext for discrimination. *Kirilenko-Ison*, 974 F.3d at 661. To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendant's] explanation and infer that the defendants intentionally discriminated against him.'" *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson v. Kroger* Co., 319 F.3d 858, 866 (6th Cir. 2003)).

"The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.'" *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id.* (citation omitted). If the plaintiff can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, *i.e.*, that the actual reason was discriminatory. That is, as indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful." *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993), *and Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148 (2000). In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the real reason serves equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence of both kinds, even if it turns out to all be the same evidence.

It is worth summarizing in some detail how all of these (variously shifting and conditional) requirements apply in the summary judgment context in particular, once the above-referenced principles of summary judgment are applied to the unique framework of indirect-evidence cases

under *McDonnell Douglas*. As one court put it, addressing Title VII claims of discrimination, "[a] defendant's summary judgment motion slightly modifies the order of [the various *McDonnell Douglas*] showings." *Sherman v. Fountain Valley Police Dep't*, No. SACV17-2217JVS(DFMX), 2019 WL 4238873, at *7 (C.D. Cal. Apr. 2, 2019) (internal quotation marks omitted).

The Sixth Circuit has stated helpfully on this topic:

> [W]hen a[ ]discrimination plaintiff bases his case on indirect evidence (*i.e.*, evidence requiring inferences to reach the conclusion that the defendant discriminated against the plaintiff), we apply the burden-shifting framework first set forth in *McDonnell Douglas* . . . . "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 661 (6th Cir. 2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996) (applying the *McDonnell Douglas* framework to a disability-discrimination claim). The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Texas Dep't of Cmty. Affairs* [450 U.S. at 253].

*Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *overruled on other grounds, Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009).

It is worth emphasizing some points about what the undersigned perceives to be an under-analyzed topic, namely, the burdens born specifically by a defendant who moves for summary judgment as to a claim of employment discrimination based on an indirect-evidence theory. As indicated above, the general idea under Rule 56 and the cases interpreting it is that the summary judgment movant bears the initial burden of showing, subject to the non-movant's opportunity to show to the contrary, that the non-movant cannot raise a genuine issue as to a material fact. *See Pittman*, 901 F.3d at 627–28 ("The moving party must demonstrate the 'basis for its motion, and

identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" (quoting *Celotex*, 477 U.S.at 323 (1986)). In the case of a defendant-movant, the defendant-movant thus bears the initial burden of showing, subject to the plaintiff's opportunity for rebuttal, that the plaintiff cannot raise a genuine issue as to one or more elements of the plaintiff's claim(s) as to which summary judgment is sought. But because of the unique nature of the three-step *McDonnell Douglas* framework and the particular burdens the parties would bear at trial, a defendant-movant's burdens are not so easily understood and are worth clarifying.

As for the first step, as noted above, the Sixth Circuit has stated that "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination." *Blair*, 505 F.3d at 524. But this is true only if the defendant-movant met its initial burden of showing the absence of sufficient evidence for a jury to reach such a conclusion. This is because, as the Sixth Circuit has made clear, the usual obligation of the summary judgment movant to make the initial showing indeed applies to a defendant's motion for summary judgment directed at indirect-evidence theories. *E.g., Banks v. Ohio*, No. 94-3866, 1995 WL 118993, at * 2 (6th Cir. Mar. 20, 1995) ("The defendants met their initial burden of showing an absence of evidence to establish a prima facie case by showing that no one was similarly situated, or treated more favorably than she was."); *Sherman*, 2019 WL 4238873, at *7 (noting that the defendants moving for summary judgment as to claims based on an indirect-evidence theory "have the initial burden to either (1) negate an essential element of [the plaintiff]'s prima facie case or (2) establish a legitimate, nondiscriminatory reason for not promoting [the plaintiff]."); *Qualls v. Regents of Univ. of Cal.*, No. 1:13-CV-00649-LJO, 2015 WL 5604293, at

*9 (E.D. Cal. Sept. 23, 2015) (noting that "under *McDonnell Douglas*, Defendants have the initial burden of demonstrating that Plaintiff cannot make a prima facie showing" of a Title VII claim), *order vacated in part on reconsideration on other grounds*, No. 1:13-CV-00649-LJO-SMS, 2015 WL 6951757 (E.D. Cal. Nov. 10, 2015).[5]

As for the second step, it is worth emphasizing that upon a defendant's motion for summary judgment (just as at trial), if the burden does shift to the defendant-movant to show a legitimate and non-discriminatory reason for its action(s), then that burden is one of mere production. *Brown*, 814 F. App'x at 80 (noting on the defendant's motion for summary judgment that it is a "burden of production [that potentially] shifts to the defendant to show a legitimate, nondiscriminatory reason for the way it treated the plaintiff"). This means that the defendant merely has to offer admissible evidence adequate to support a finding that the defendant-movant had such a reason and does not have to show that no reasonable jury could fail to find that the defendant-movant had such a reason.

As for the third step, it does not appear that the defendant-movant bears any initial burden. That is, the defendant-movant need not make an initial showing that the plaintiff cannot raise a genuine issue as to pretext. The rationale for this, presumably, is that the defendant—by showing evidence of an actual (legitimate and non-discriminatory) reason—in the second step already put the onus back on the plaintiff to raise a genuine issue that the reason was pretextual; thus, the defendant need not specifically attack any claim of pretext in order for the plaintiff to be obligated to present sufficient evidence of pretext. And in the context of summary judgment, sufficient evidence means evidence sufficient for a jury to find pretext by a preponderance of the evidence.

---

[5] On reconsideration, the defendants specifically challenged this proposition. The court, though granting the defendants' motion in part on other grounds, specifically declined to disavow this proposition. *Qualls*, 2015 WL 6951757 at *3. And the court noted what this Court is addressing herein: the "complex issues related to the interplay of the summary judgment standard and *McDonnell Douglas*." *Id.*

*Id.*; *see also Blair*, 505 F.3d at 532 ("[T]o survive summary judgment a plaintiff need only produce enough evidence to . . . rebut, but not disprove, the defendant's proffered rationale.").

In the Court's view, what the summary judgment analysis boils down to, stated as concisely as possible (which, alas, is not particularly concisely), is set forth in the following paragraph.

To obtain summary judgment on employment discrimination or retaliation claims[6] grounded exclusively on the so-called "indirect-evidence" theory, the defendant must *either* (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing[7] that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b)

---

[6] When discussing employment discrimination statutes, courts typically refer to a retaliation claim as a kind of "discrimination" claim. *E.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (stating in the context of Title IX claims that "[r]etaliation against a person because that person has complained of sex discrimination is another form of intentional sex discrimination"), and thus for procedural purposes usually is treated just like non-retaliation (*i.e.*, general) forms of discrimination—and, when treated differently from general discrimination, tends to be treated differently in a way that favors the plaintiff. *Hubbell v. FedEx SmartPost, Inc.*, 933 F.3d 558, 569 (6th Cir. 2019) ("Although we had previously held that the same requirements [as to what amounts to an actionable adverse employment action] apply to Title VII retaliation claims and Title VII discrimination claims, the Supreme Court made clear in *Burlington Northern* that [such] requirements for a retaliation claim are in fact considerably less stringent." (*citing Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 59–69 (2006) (rejecting the Sixth Circuit's contrary view))).

Nevertheless, courts often refer to retaliation claims as distinguishable from "discrimination" claims—distinguishable, at least, from the general kind of discrimination claim that is based on the plaintiff being in a protected class, not the plaintiff engaging in protected conduct.

[7] To be clear, as indicated in the quoted language from *Blair*, the requirement here is not merely to *articulate* a legitimate reason, but also to *present evidence* that the articulated legitimate was in fact at the actual reason at the time of the adverse action at issue was taken. This has been made apparent by the Supreme Court:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against

show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if : (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's indirect-evidence *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.[8]

<u>DISCUSSION</u>

For the reasons stated below, the Court concludes: (i) that Defendant has shown the absence of a genuine issue of fact as to one element (causation) of Plaintiff's indirect-evidence *prima facie*

---

the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant. If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the factual inquiry proceeds to a new level of specificity. Placing this burden of production on the defendant thus serves simultaneously to meet the plaintiff's prima facie case by presenting a legitimate reason for the action and to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext. The sufficiency of the defendant's evidence should be evaluated by the extent to which it fulfills these functions.

*Texas Dep't of Cmty. Affairs*, 450 U.S. 248, 254–56 (citation and footnotes omitted). The Court perceives that a defendant-employer meets its (evidentiary) burden at step two if it presents evidence that a legitimate reason was at least purported to be the real reason at the time the adverse action was taken. If the defendant-employer can do that, then the burden shifts to the plaintiff to show that the purported reason in fact was not the actual reason.

[8] As indicated above, a plaintiff's (conditional) requirement to show "pretext" is actually a (conditional) requirement to show not just pretext (*i.e.*, that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

case of FMLA retaliation; and, alternatively, (ii) that Defendant has showed a legitimate, non-discriminatory reason for Plaintiff's suspension and that there is no genuine issue of material fact as to whether that reason is pretextual. In other words, the Court will grant the Motion because Defendant prevails at the first step of the *McDonnell Douglas* analysis and, in any event, would prevail at the two remaining steps.

A. FMLA Retaliation

Defendant spearheads its Motion with a statute-of-limitations argument. (*See generally*. Doc. No. 20). However, the cornerstone of that argument is Defendant's contention that the purported FMLA retaliation was not willful (which, if true, minimizes to Defendant's advantage the length of the applicable limitations period). But this contention turns in part on whether there was retaliation at all; there could not have been *willful* FMLA retaliation if there was *no* FMLA retaliation. Therefore, the Court will start by addressing the issue of whether the record, viewed in light most favorable to Plaintiff, supports an indirect-evidence *prima facie* case of FMLA retaliation.

> To establish a *prima facie* case of FMLA retaliation, Plaintiff must demonstrate [that]: (1) [he] was engaged in an activity protected by the FMLA; (2) [Defendant] knew that [he] was exercising [his] rights under the FMLA; (3) after learning of the [Plaintiff's] exercise of FMLA rights, [Defendant] took an employment action adverse to [him]; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 616 (6th Cir. 2019) (citing *Donald v. Sybra, Inc.*, 667 F.3d 757, 761 (6th Cir. 2012)).

Here, there is no dispute that Plaintiff engaged in activity protected under the FMLA when he took his paternity leave. (*See* Doc. No. 20 at 10–11). There is also no dispute that Defendant disciplined Plaintiff and that such discipline was an adverse employment action. (*See id.* at 10). Defendant, however, disputes that the Chief Resident—the person who referred Plaintiff to the

disciplinary committee—or the members of said committee, were aware of the paternity leave.[9] (*See id.* at 11–12). Defendant also disputes that there was a causal connection between Plaintiff's FMLA leave and the adverse employment action, *i.e.*, the discipline.[10] (*See id.* at 12–13). In other words, Defendant challenges the second and fourth elements of Plaintiff's indirect-evidence *prima facie* case of employment discrimination.

### 1. Defendant's Knowledge of Plaintiff's Protected Activity

As to the second element, the relevant question on the instant Motion is whether the evidence is "sufficient to establish that the individuals charged with taking the adverse employment action knew of the protected activity." *Mulhall v. Ashcroft*, 287 F.3d 543, 552 (6th Cir. 2002) (finding summary judgment appropriate where the plaintiff failed to produce direct or circumstantial evidence that the decision makers knew the protected activity); *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) (same).

Defendant argues that the Chief Resident was unaware of Plaintiff's paternity leave because she became responsible for scheduling only in July of 2018, after Plaintiff's leave had

---

[9] The discipline at issue here is the two-week suspension of Plaintiff and the related permanent notation of the suspension in Plaintiff's "folder," resulting in the disclosure of the suspension in response to "any inquiries concerning [Plaintiff's] training." (Doc. No. 28 ¶ 16). This discipline was imposed by the disciplinary committee (and subsequently confirmed by the appellate committee), but the record does not appear to contain the names of the persons that sat on the disciplinary committee. (*See id.*).

[10] In addition to the discipline itself, Plaintiff contends that Defendant continues to refuse to expunge the suspension from his disciplinary record. (*See* Doc. No. 1 ¶¶ 21, 23; Doc. No. 27 at 3, 7–8 (citing Doc. No. 29-1 at 22–23)). Plaintiff characterizes the refusal to expunge the suspension is an adverse action in the introduction to his Opposition. (*See* Doc. No. 27 at 3). However, Plaintiff later refers to the refusal to expunge only as part of his argument on willfulness. Without more, the Court declines to construe the refusal to expunge as a separate adverse employment action because the permanent notation of the suspension is part of the discipline Defendant initially imposed upon Plaintiff. In any event, even if the Court were to consider any subsequent refusal to expunge the suspension as a distinct adverse action, the Court's reasoning would remain the same because any refusal to expunge would be even more remote in time from Plaintiff's FMLA leave than the initial discipline. (*See infra* Section 2).

ended. (*See* Doc. No. 20 at 11 (citing Doc. No. 22-2 at 56)). Plaintiff counters that incoming chief residents start taking responsibility three to four months before their official start date. (*See* Doc. No. 27 at 11 (citing doc. No. 29-19 ¶ 1)). Moreover, Plaintiff counters that the information about his leave "was out there" and within the knowledge of the other 14 members of Plaintiff's "small" class of residents, and that other managing members with whom the Chief Resident was in contact, including the Chair, were aware of the leave. (*See id.* (citing doc. No. 29-19 ¶¶ 2, *and* Doc. No. 29-2 at 19)).

The Court finds that the record, viewed in the light most favorable to Plaintiff, raises a genuine dispute of material fact on whether the disciplinary committee was aware of Plaintiff's leave at the time it imposed the discipline. Indeed, the Chief Resident had access to schedules and was in contact with a small group of people with knowledge of Plaintiff's leave. A jury could reasonably infer that the Chief Resident had knowledge and that the disciplinary committee (or its individual members) interacted with the Chief Resident before rendering its decision, meaning that a jury could also reasonably infer that the disciplinary committee (or its individual members) had knowledge. *See Mulhall*, 287 F.3d 553 (circumstantial evidence is sufficient to support knowledge at the summary judgment stage; further discussing a case standing for the proposition that "knowledge of a plaintiff's protected activity can be inferred from evidence of the prior interaction of individuals with such knowledge and those taking the adverse employment action") (citing *Kralowec v. Prince George's Cnty., Md.*, 503 F. Supp. 985 (D. Md. 1980), *aff'd*, 679 F.2d 883 (4th Cir. 1982), *cert. denied*, 459 U.S. 872 (1982)). The Court therefore will not grant summary judgment based on the knowledge-of-protected-conduct element.

## 2. Causal Link Between the Protected Activity and the Suspension

The fourth element of an indirect-evidence *prima facie* case of retaliation, causation, is where the rubber meets the road in this case. The Court will first examine whether the record, viewed in light most favorable to Plaintiff, could support a finding that Defendant issued the discipline because of Plaintiff's paternity leave. If so, the Court will look at whether the Defendant has shown a non-discriminatory reason for the discipline and, if so, whether there is a genuine issue of material fact as to pretext.

As to the first question, Plaintiff relies on the temporal proximity between his paternity leave (his protected activity) and the suspension (the adverse employment action). (*See* Doc. No. 27 at 13–14).[11] The Sixth Circuit has noted that "where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise."[12] *DiCarlo v. Potter*, 358 F.3d 408, 421 (6th Cir. 2004) (collecting cases), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 180 (2009).[13] Defendant counters that Plaintiff's leave and

---

[11] It is clear that "the causality determination [implicated by the fourth element] should . . . . be informed by what we have always advised: namely, by reference to the temporal proximity between 'the plaintiff's exercise of protected rights' and the subsequent adverse action. *Wallner v. Hilliard,* 590 F. App'x 546, 554 (6th Cir. 2014) (quoting *Nguyen*, 229 F.3d at 563).

[12] In context, it is clear that *DiCarlo* was referring here specifically to an inference of the existence of the fourth (causal connection) element of an indirect-evidence prima facie case of retaliation.

[13] Sixth Circuit precedent is contradictory on whether additional evidence, *i.e.*, other than temporal proximity, is required. *Compare Nguyen v. City of Cleveland*, 229 F.3d 559, 567 (6th Cir. 2000) ("there may be circumstances where evidence of temporal proximity alone would be sufficient to support [an] inference" of the required causal relationship), *with Parkhurst v. Am. Healthways Servs., LLC*, 700 F. App'x 445, 451 (6th Cir. 2017) (temporal proximity, alone, is not sufficient evidence of discrimination); *Parnell v. West*, 1997 WL 271751, at *2 (6th Cir. 1997) ("[T]emporal proximity alone will not support an inference of [the existence of the fourth element of an indirect-evidence *prima facie* case of] retaliatory discrimination when there is no other compelling evidence") (citing *Cooper v. City of N. Olmsted*, 795 F.2d 1265, 1272 (6th Cir. 1986)). The Court needs not resolve this contradiction here because (i) it concludes below that there is insufficient temporal proximity in this case, and (ii) Plaintiff relies on the line of cases that requires

the suspension are too distant in time for his inference to apply. (*See* Doc. No. 20 at 12–13). Defendant and Plaintiff cite cases in which courts considered various periods of time to be, respectively, too long or short enough. (*See id.* (collecting cases); Doc. No. 27 at 13–14 (same)).

In addition to reading the cases cited by the parties, the Court has conducted its own research on this issue. Overall, it appears that in this Circuit, courts have found periods of two to three months to be sufficiently close to support an inference of retaliation, but generally have found to the contrary for periods when the period in question was longer than four months. *See Judge v. Landscape Forms, Inc.*, 592 F. App'x 403, 409 (6th Cir. 2014) ("We have found sufficient evidence of a causal connection where the time between when the employee's leave expired or the employee requested leave and the employee's termination was two to three months." (collecting cases)); *Flagg v. Staples the Off. Superstore E., Inc.*, 138 F. Supp. 3d 908, 918 (N.D. Ohio 2015) (noting that "for more than three months beyond the expiration of leave, the Sixth Circuit has held no inference of a causal connection may be drawn" (collecting cases); further opining that "[i]n light of the above Sixth Circuit holdings, temporal proximity of five months is insufficient to establish a causal connection in and of itself."); *Parnell*, 1997 WL 271751 at *3 (noting that "previous cases that have permitted a prima facie case to be made based on the proximity of time have all been short periods of time, usually less than six months") (unpublished); *e.g. Leavy v. FedEx Corp.*, No. 19-CV-2705-JTF-TMP, 2021 WL 4171454, at *9 (W.D. Tenn. Feb. 18, 2021) (period of four months, without more, was too long to establish retaliation), *report and*

---

additional evidence in its argument on the third step of the *McDonnell Douglas* analysis. (*See* Doc. No. 27 at 17 (noting that temporal proximity cannot be the sole basis for finding pretext under Sixth Circuit law)). In any event, here the record contains (purported) indirect evidence in addition to the (purported) temporal proximity. This (purported) indirect evidence is to the effect that another resident who took leave was suspended, that a resident who missed work during his last week of residency was not suspended, and that there were other complaints against Defendant; it also includes the Group Message. This (purported) indirect evidence could hypothetically be sufficient to support the finding of a causal link if coupled with sufficiently close temporal proximity.

*recommendation adopted*, (W.D. Tenn. Aug. 23, 2021), *aff'd*, No. 21-5882, 2022 WL 19039658 (6th Cir. Dec. 20, 2022); *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 308 (6th Cir. 2016) (period of seven months was too long); *Wallner*, 590 F. App'x at 554 (reversing district court's finding that the time period was too long to support a causal connection, because the relevant time period was actually nine days rather than four months as the district court erroneously found); *Cooper*, 795 F.2d at 1273 (four months were too long to establish an inference of retaliation); *Sesson v. United Parcel Serv., Inc.*, No. 22-5564, 2023 WL 4864283, at *4 (6th Cir. July 31, 2023) (one year and three months was too long); *Nolen v. FedEx Servs.*, No. 13-6245, 2014 WL 12887530, at *3 (6th Cir. May 28, 2014) (nine months were "simply too long of a time period for temporal proximity alone to support an inference of retaliation"); *Clark v. Walgreen Co.*, 424 F. App'x 467, 473 (6th Cir. 2011) (three months were not too long); *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 550 (6th Cir. 2008) ("less than three months" was a period short enough to support the inference); *Bryson v. Regis Corp.*, 498 F.3d 561, 571 (6th Cir. 2007) (period of three months was not too long); *O'Gwynn v. Rutherford Cnty., Tenn.*, No. 3:17-CV-00503, 2018 WL 5830834, at *3 (M.D. Tenn. Nov. 6, 2018) (five months were too long); *Brown v. ASD Computing Ctr.*, 519 F. Supp. 1096, 1116 (S.D. Ohio 1981) (three months were not too long), *aff'd sub nom. Brown v. Mark*, 709 F.2d 1499 (6th Cir. 1983).

In short, the Court has no doubt that, absent any other evidence to support an inference of a causal connection, a lapse of over four months is insufficient to satisfy the fourth element of an indirect-evidence *prima facie* case of retaliation. Here, even taking as reference points the end of Plaintiff's paternity leave and the written reprimand that that ultimately led to the suspension, the relevant period time is well over four months (*i.e.*, from June 11, 2018, to October 22, 2018). Accordingly, the Court finds that the temporal proximity in this case does not warrant an inference

of a causal connection between Plaintiff's protected conduct and the adverse employment action he experienced. In addition, without sufficiently close temporal proximity, the additional evidence mentioned by Plaintiff (*see supra* n.13) is simply too weak to establish such causal link. Therefore, the Court finds that Plaintiff's FMLA claim fails at the first step of the *McDonnell Douglas* analysis.

### 3. Legitimate Non-Retaliatory Reason and Pretext

In any event, Plaintiff's claim alternatively would fail at the third step of the *McDonnell Douglas* analysis.

Defendant would prevail at the second step, thus putting the burden upon Plaintiff to prevail at the third step, inasmuch as it has articulated a legitimate, non-retaliatory reason for the discipline. The reason, according to Defendant, is Plaintiff's unexcused absence from work on October 5, 2018 (long post-dating the period of Plaintiff's FMLA leave), Plaintiff's failure to answer the Chief Resident's emails (one from Friday and one from Monday morning) until the following Monday afternoon, and the tone of Plaintiff's answer to those emails. (*See* Doc. No. 20 at 13–14). The record supports Defendant's argument. Specifically, the Chief Resident's written reprimand unambiguously sets forth these reasons. (*See generally* Doc. No. 29-7). And so does the letter of suspension. (*See generally* Doc. No. 29-8). In the same vein, the unanimous appellate committee's determination states "a breach in the leave policy" as the basis for its upholding of the discipline and recommends a "mandatory professionalism course." (Doc. No. 22-1 at 131). None of these documents refer to Plaintiff's FMLA leave. Instead, they all state a reason for the adverse employment action that is non-retaliatory and legitimate, thus satisfying Defendant's burden at the second step.

Plaintiff contends that Defendant failed to articulate a legitimate, non-retaliatory reason for the discipline, arguing that there was no formal requirement for him to inform the Chief Resident of his leave and answer her emails over the weekend.[14] (*See* Doc. No. 27 at 14–15). But this argument entirely ignores the tone of his answer and, possibly, common sense in a professional and/or clinical setting. Similarly, Plaintiff contends that the disciplinary committee did not conduct its own investigation into the allegations and that Defendant refused to expunge the discipline from Plaintiff's record after Plaintiff "completed . . . what was required of him[.]" (*Id.* at 16). But nothing indicates that an investigation was necessary, inasmuch as the emails speak for themselves; nor does the Court see why the permanent character of the notation in Plaintiff's disciplinary record would have been improper in the first place. (*See* Doc. No. 22-1 at 125–26 (letter of suspension stating that the notation would be permanent)).[15]

---

[14] Plaintiff frames this argument as pertaining to step two of the *McDonnell Douglas* analysis. (See Doc. No. 27 at 14–15). However, it actually goes to step three of said analysis. In any event, this argument, whether understood as pertaining to step two or step three, is to no avail.

[15] As part of the arguments regarding willfulness and the statute of limitations, Plaintiff contends that the Chair told him that he would expunge the suspension from his record if he completed a rotation in a specific clinic, which Plaintiff did, but that the Chair "explained [in his deposition that Defendant] would not expunge the suspension because of the lawsuit filed by [Plaintiff] and [the Chair's] belief that [Plaintiff] is actively trying to 'hurt' [Defendant]." (*Id.* at 7–8 (citing Doc. No. 29-1 at 22–23)). The deposition transcript Plaintiff cites in support of this contention is somewhat more nuanced. The Chair stated that he did not expunge the suspension from Plaintiff's record because (i) it would "remove the idea that it ever actually happened . . . and we know that it did," and (ii) the Chair did not recall having a meeting about expunging the suspension and did not know whether a reconsideration was possible. (Doc. 29-1 at 45–56). In response, Plaintiff's counsel questioned the Chair about his willingness to expunge the suspension at the time of the deposition, to which the Chair answered it "would be problematic" because Plaintiff is "suing us regarding this." (*Id.* at 23). When questioned about his authority to expunge the suspension, the Chair answered that he would have to "clear it" with Defendant's legal department. (*Id.*).

It is true that a refusal to expunge the suspension on the basis that Plaintiff filed this lawsuit could conceivably amount to retaliation. *See Hawkins v. Ctr. for Spinal Surgery*, 34 F. Supp. 3d 822, 845 (M.D. Tenn. 2014) (denying summary judgment on claim that the defendant retaliated against the plaintiff for filing a FMLA lawsuit); *Sosby v. Miller Brewing Co.*, 415 F. Supp. 2d 809, 822 (S.D. Ohio 2005) (considering a similar argument but granting summary judgment in favor of the defendant where adding such claim would have been futile), *aff'd*, 211 F. App'x 382 (6th Cir. 2006). However, it is not at all clear that the Chair's testimony indicates that this is what occurred; instead, it may indicate only that the Chair

As for the third step, in support of his argument that Defendant's stated reasons for the discipline were pretextual, Plaintiff points to (i) the Group Message,[16] (ii) other complaints filed by residents who believe that Defendant has infringed upon their FMLA rights, and (iii) the fact that another resident who had taken FMLA leave also faced suspension (although the suspension was not executed for reasons not relevant here). (*See* Doc. No. 27 at 17–19 (citing Doc. No. 29-2 at 34–35,[17] *and* Doc. No. 29-12 at 8–9)). Plaintiff also contends that other residents who missed work were not suspended. (*See id.* at 19 (citing Doc. No. 29-1 at 11–13,[18] *and* Doc. No. 22-1 at 40, 47–50)).

Here, the record does not support a finding of pretext by a reasonable jury by preponderance of the evidence. Specifically, Plaintiff cannot establish that Defendant's stated

---

viewed any potential expungement of a record of Plaintiff's suspension as a potential alteration of records regarding a matter in litigation, which is certainly something that can be improper.

Ultimately, the Court will not address this issue because Plaintiff's Complaint in this case is not premised upon the Chair's refusal to expunge the suspension at the time of the deposition (*see generally* Doc. No. 1)—*i.e.*, Plaintiff does not allege that such refusal constituted an adverse employment action—and Plaintiff did not request to amend the Complaint and perhaps would have had this request properly denied anyway. *See Sosby*, 415 F. Supp. 2d at 822 (expressing doubts on whether the plaintiff could add a similar claim at the summary judgment stage)).

[16] The Court notes that the Group Message, at best, indicates that Defendant would have taken measures if it uncovered a "pattern" of sick and/or FMLA leave. Here, the record only indicates one such leave by Plaintiff, *i.e.*, his paternity leave, inasmuch as Plaintiff claims that his absence on October 5, 2018, was for either an interview or a networking conference, or both (Plaintiff's filings are contradictory on this point. (*Compare* Doc. No. 1 ¶ 15 ("[Plaintiff] had an interview for a fellowship position on October 5, 2018."), *with* Doc. No. 27 at 2 ("[Plaintiff] took 1 day off – October 5, 2018, to attend a networking conference in Texas")). Furthermore, the record contains no indication that the Group Message concerned Plaintiff or that Defendant actually took any action against a resident for taking sick and/or FMLA leave on multiple occasions.

[17] This citation is to a deposition transcript, in which the Chair states that Defendant investigated another resident for being absent from work, and that a suspension was recommended but not carried out because "deliberations were compromised," possibly because a member of the disciplinary committee was not impartial and/or because the Resident reported sexual assault.

[18] This citation is to a page of the deposition transcript, wherein the Chair states that a resident was disciplined for falsely calling in sick during his last week of residency but did not receive a suspension. The Court notes that it is unclear whether Defendant could have acted fast enough to actually suspend this resident, given that the conduct occurred during the resident's last week of work.

reasons for the suspension had no basis in fact, inasmuch the emails—and/or the lack thereof—between Plaintiff and the Chief Resident are part of the record. As for Defendant's actual motivation, Plaintiff points to unrelated suspensions—or the lack thereof, a Group Message sent approximately four months prior, as well as unrelated, purported FMLA violations by Defendant. But none of this changes that Plaintiff missed work on a Friday, did not answer emails until the next Monday afternoon, and then finally answered the Chief Resident's email with what reasonably was taken to be a defiant tone. The record contains no tangible indication that anything other than these events led to the decision to suspend Plaintiff. *Cf. Stage v. PPG Indus., Inc.*, No. 1:10-CV-5, 2011 WL 2532219, at *6 (E.D. Tenn. June 24, 2011) (finding that there was "not a scintilla of proof" that the plaintiff's termination was connected to her FMLA leave where "the only reference . . . to [the plaintiff's] work attendance [was] an unapproved vacation day she took" and not the plaintiff's taking of FMLA leave). Timing also supports Defendant's stated reason for the discipline, inasmuch as the Chief Resident issued the reprimand and related referral for discipline only two weeks after Plaintiff's response to her emails and, as discussed above, over four months after Plaintiff returned from his paternity leave. Thus, information in the record, including regarding the timing of the suspension, shows that the written reprimand and subsequent discipline were a direct result of Plaintiff's absence from work without written approval on October 5, 2018, failure to answer related emails, and use of a defiant tone when he finally answered those emails. Finally, the court sees no reason why the discipline would have been unjustified under these circumstances. Plaintiff's attempts to raise a genuine dispute as to pretext rely on pure conjecture and thus are to no avail. The Court therefore finds that Plaintiff would fail to meet his burden at the third step of the *McDonnell Douglas* analysis had Plaintiff, contrary to the Court's decision above, even gotten past step one. *See Leavy*, 2021 WL 3722339 at *7 (granting

summary judgment where the Plaintiff failed to raise a genuine dispute as to pretext) (citing *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 724 (6th Cir. 2006) ("It is well settled that [m]ere personal beliefs, conjecture and speculation are insufficient to support an inference of [ ] discrimination." (quotation marks omitted))); *Gerlach v. Siemens Corp.*, No. 5:20-CV-297-CHB, 2021 WL 5412108, at *5 (E.D. Ky. Nov. 18, 2021).

B. <u>Statute of Limitations</u>

Because the Court finds that Plaintiff' claim fails to survive a *McDonnell Douglas* analysis, as it must (given the lack of direct evidence) in order for it to proceed to trial, the Court need not examine the parties' arguments regarding the statute of limitations.

<u>CONCLUSION</u>

For the reasons discussed herein, Defendant's Motion (Doc. No. 19) will be granted. An appropriate accompanying order will be entered.

*Eli Richardson*
<u> </u>
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE